## JACKSON v. THE STATE.

1. The only effect the newly discovered evidence could possibly have would be to impeach the evidence of one of the State's witnesses, and therefore, under the oft repeated rulings of this court, a new trial cannot be granted on this ground.

2. Alleged error in admitting oral evidence cannot be considered unless the evidence objected to is itself set out in the motion for a new trial or in the bill of exceptions.

3. The evidence, though far from satisfactory to this court, is sufficient to authorize the verdict, and there being no error of law for correction, the discretion of the trial judge in refusing to grant a new trial was not abused, though the case was one in which it might well have been exercised in granting a new trial.

LUMPKIN, J., concurring with great doubt.          Judgment affirmed.
    October 30, 1893.

Indictment for murder. Before Judge JENKINS. Greene superior court. August term, 1893.

John Jackson was convicted of the murder of Richard J. Youngblood, with a recommendation to life im-

prisonment. His motion for a new trial was overruled, and he excepted. It appears from the evidence that Youngblood was killed in his store on the night of Monday, December 26th, 1892, the indications being that he was shot with a gun from the outside. McJunken testified: I went by his store Monday evening about seven o'clock; the door was closed; don't know whether Youngblood was there. I saw a negro there; thought it was John Jackson at the time. He came right along and passed right to my rear and went down on the last side of Youngblood's store, and then came back and asked me where was Youngblood. I told him I thought he was at the store, and he said it was so cold that he would not stay. He went back the same way that he came. He passed the mill, and I saw him when he went into Caldwell's store. I have known John Jackson for three years; he has been working around there. I am positive that this was the man I saw there. I said at the coroner's inquest that I was informed that the boy I saw was a yellow boy living at Woods'; after seeing him I am satisfied. It was dark and sleeting; he was about ten feet in my rear. I didn't turn only my head. Heard no gunshots that night; only firecrackers. The party I saw went back of Caldwell's store. I watched him, and saw his legs under the house as he went up on Caldwell's platform. I could not have been mistaken in reference to this John Jackson being the man I saw. It was cloudy, and I saw it was a colored man; but it was not a yellow negro.

1. The first ground of the motion for a new trial is based upon alleged newly discovered evidence as contained in the affidavits of the coroner and one of the jury that held an inquest over the body of Youngblood. These affidavits are to the effect that McJunken was a witness before the coroner's jury; and that he stated in his testimony at that time that he had noticed a negro

boy in the neighborhood of Youngblood's store on the night of the murder, that he was a boy about half grown and that he came in the direction of Eatonton road and returned that way, that witness didn't know who the boy was, and that this boy was the only person that he saw in the neighborhood of Youngblood's store on the night of the murder. The usual affidavits of the defendant and his counsel accompany this ground; and it appears that the counsel represented the defendant by appointment of the court.

2. The court admitted in evidence, over the defendant's objection, certain alleged incriminating admissions "as evidenced by the testimony of John S. Hall"; the ground of objection being that the defendant was induced by Hall's conduct and language to make the admissions on the promise of Hall that he would need no lawyer to defend him of the charge of murder for which he was confined in jail, if the defendant would only tell what he knew about it. The error assigned is, in not excluding the admissions on the grounds that they were induced by the hope of reward, and in leaving to the jury to pass upon whether the admissions were made voluntarily and free from hope of reward or fear of punishment. The motion for new trial does not recite the testimony so objected to. In the brief of evidence appears the testimony of Hall, substantially as follows: I saw John Jackson the Friday after the murder. I asked him if he didn't go out to the river the Sunday before, to see Caldwell; he said, yes. I asked him why he went, and he said Caldwell sent for him. I asked him if he was not under contract with Linticum. He said he was. I then asked him if he didn't have an understanding with Caldwell to come back Monday, and he said he did. I asked him why he did not go and confirm the contract. He said he didn't go, and then said, "I don't know anything about the murder of Young-

blood." I said, I did not accuse him of it. He said he could prove his whereabouts from Thursday before the murder until Thursday after, by Fed Armour and his wife. Said he could prove by them that he was at their house on the night of the killing. I replied, "That clears you then." He went off, kept looking back, and seemed uneasy. I saw him two weeks after, and asked him if he had not traded coats with somebody in the Fork and paid one dollar and a half in money. He said he had traded coats, but only paid one dollar, in front of Vincent's in Greenesboro; said he got the money from Linticum Saturday before the homicide. I had a conversation in the jail with defendant. I was feeding the prisoners during sheriff English's absence; saw some parties outside of the jail talking to Isom and defendant. I told them, "If you think all this talking to people will do you any good, you had better hush." Afterwards John said to me he was the best witness I had, and I said I knew he was if he would tell all he knew. I said if he was a witness he would not need a lawyer. Defendant sent for me to come to the jail, and started the conversation himself. He asked me, if he was only a witness, if he would need a lawyer. I told him, no; further told him, if he was not able to employ, the court would give him one. Before he made his statement I told him that I had nothing whatever to offer him, and it would not be lawful if I did; that I wanted him to distinctly understand this; and then told him that I had nothing to offer him. He then told me that he was down there the night of the murder, with Dawse Williams and Isom Lewis, playing cards. They went up to the store to buy some cheese, etc. Caldwell came in and took a gun, and he and Dawse Williams fired and killed Youngblood. John then went up the river to George Jordan's, getting there the next morning at breakfast. Caldwell was suspected by many to have

been connected with the murder, as soon as Dr. Young-blood was killed.   John possibly knew that when I had the conversation with him on Friday, in which he said he knew nothing of the killing.

Linticum testified that the defendant came to him on Saturday before Christmas and wanted to borrow ten dollars, which witness refused to let him have, and that he paid him no money whatever before the murder. Bernhart testified that he heard the second time defend-ant made a confession to Hall, and corroborated Hall's testimony.   Afterwards defendant sent for witness and Hall, and said what he had said to them before was tales.   Other circumstances in evidence, which need not be here detailed, point to the defendant as the murderer. On the other hand numerous witnesses appeared in his behalf, and gave testimony tending to prove an *alibi*. The motion for new trial contains the grounds that the verdict is contrary to law and evidence.

HART & SIBLEY, J. B. PARK, Jr., JAMES DAVISON and EDWARD YOUNG, for plaintiff in error.

J. M. TERRELL, attorney-general, and H. G. LEWIS, solicitor-general, by HINES, SHUBRICK & FELDER, *contra*.